IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

ICEY L. MEADOWS,

      Plaintiff,

v.                               CASE NO. 2:10-cv-00869

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.


**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  By standing order, this case was referred to this United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Plaintiff, Icey L. Meadows (hereinafter referred to as "Claimant"), protectively filed applications for SSI and DIB on March 2, 2006, alleging disability as of December 30, 2005.  (Tr. at 18.)  The claims were denied initially and upon reconsideration.  (Tr. at 44-46, 48-52.)  Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 43.)  A hearing was held

on July 11, 2007, before the Honorable Theodore Burock.  (Tr. at 226-50.)  The ALJ conducted a supplemental hearing on May 15, 2008.  (Tr. at 251-60.)   By decision dated May 30, 2008, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 18-30.)   The ALJ's decision became the final decision of the Commissioner on April 29, 2010, when the Appeals Council denied Claimant's request for review.  (Tr. at 4-6.)  On June 27, 2010, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. §§ 404.1520, 416.920 (2008).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. §§ 404.1520(a), 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. §§ 404.1520(b), 416.920(b).  If the claimant is

not, the second inquiry is whether claimant suffers from a severe impairment.  Id. §§ 404.1520(c), 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. §§ 404.1520(d), 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2008).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant

3

satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 20.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of major depressive disorder and generalized anxiety disorder. (Tr. at 20.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 23.) The ALJ then found that Claimant has a residual functional capacity for a full range of work at all exertional levels, but is limited to performing routine repetitive tasks. (Tr. at 24.) As a result, Claimant cannot return to her past relevant work. (Tr. at 28.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as cleaner, cook helper, cashier, housekeeper, cafeteria attendant and inspector, which exist in significant numbers in the national economy. (Tr. at 29.) On this basis, benefits were denied. (Tr. at 30.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the

4

case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was forty-five years old at the time of the administrative hearing. (Tr. at 230.) Claimant completed the ninth grade. (Tr. at 231.) In the past, she worked as the kitchen manager at a restaurant. (Tr. at 234.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

The record includes treatment notes from Cabin Creek Riverside Health Center dated February 25, 2005, through March 13, 2006. (Tr. at 99-106.) Claimant was treated for acute bronchitis, gastrointestinal problems, pain in the left thumb and neck and back

5

pain.

On May 25, 2006, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant had no severe impairments. (Tr. at 112-19.)

On May 19, 2006, Nilima Bhirud, M.D. examined Claimant at the request of the State disability determination service. Claimant gave a history of backache and arthritis in her left hand. Claimant reported having diarrhea every day. (Tr. at 120.) Claimant had no swelling or tenderness in the right hand. The joints of the right hand were normal, and she could grip 40 pounds. On the left, Claimant had no swelling or tenderness. Joints on the left hand were normal, and she could grip 35 pounds. Claimant had swelling and tenderness at the base of her left thumb. (Tr. at 122.) In summary, Claimant had mild lumbar tenderness with straight leg raising negative on both sides. Claimant had tenderness over the right kidney, which appeared to be enlarged. On examination of her left hand, she had swelling and tenderness at the base of her left thumb. Dr. Bhirud recommended that Claimant see a rheumatologist and have a CT scan of her abdomen. (Tr. at 123.)

The record includes treatment notes from Charleston Area Medical Center dated June of 2006, through September of 2006. On June 5, 2006, Claimant complained of abdominal pain with intermittent diarrhea. (Tr. at 134.) Claimant had mild

intrahepatic ductal dilatation with a moderately distended gallbladder and premature atherosclerosis. (Tr. at 134.) Claimant underwent endoscopy on June 8, 2006, and it showed changes consistent with grade I esophagitis, rule out Barrett's epithelium and changes consistent with distal gastritis and duodenitis, rule out Helicobacter pylori. (Tr. at 137.) A colonoscopy was unremarkable, and the physician felt that Claimant probably had irritable bowel syndrome and reflux. (Tr. at 137.) Claimant was advised to go on a GERD regimen and continue taking Aciphex and to increase the amount of fiber in her diet. (Tr. at 138.) On June 30, 2006, Claimant underwent an MRI of the abdomen without contrast. The impression was diffuse biliary dilation without identification of the cause. There was an hydropic distended gallbladder with a possible rounded filling defect in the gallbladder neck, indicating an impacted stone. (Tr. at 143.)

On July 26, 2006, Claimant underwent vascular studies for abdominal pain, which were normal. (Tr. at 125.) On August 9, 2006, Claimant was diagnosed with cholelithiasis/cholecystitis, arthritis and status post bilateral tubal ligation following complaints of intermittent abdominal discomfort and diarrhea after eating meals. Claimant underwent gastroscopy evaluation. Postoperative diagnosis of an upper endoscopy showed changes consistent with grade I esophagitis, rule out Barrett's epithelium, changes consistent with distal gastritis and duodenitis, rule out

Helicobacter pylori.   A CT of the abdomen showed an enlarged gallbladder, but it appeared otherwise unremarkable. (Tr. at 134.)

Claimant was referred for laparoscopic cholecystectomy on August 10, 2006.  (Tr. at 127.)  On August 13, 2006, Claimant complained of abdominal pain following her gallbladder surgery. Claimant was diagnosed with acute abdomen with free air status post cholecystectomy.  (Tr. at 146.)  Claimant was diagnosed with a bile leak and underwent ERCP with biliary sphincterotomy and stent placement on August 15, 2006.  (Tr. at 149.)  On September 15, 2006, Claimant underwent a CT of the chest with contrast, which showed a small pericardial effusion and a 5 mm subpleural nodule left lung base which was too small to accurately characterize and too small to evaluate with PET imaging.  A follow up chest PT was recommended.  (Tr. at 157.)  On December 5, 2006, Claimant underwent ERCP with biliary stent removal.  (Tr. at 180.)

On July 13, 2006, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform medium work, with an occasional ability to balance, stoop, crouch and crawl and a need to avoid concentrated exposure to extreme cold, heat and vibration.  (Tr. at 158-65.)

The record includes handwritten treatment notes from Dr. Bhirud dated August 24, 2006, through April 26, 2007.  Claimant reported complaints of numbness and tingling in her hands.  On February 27, 2007, Dr. Bhirud noted that an EMG was normal.  (Tr.

8

at 169.)  Claimant reported problems with breathing, but continued to smoke a pack of cigarettes a day.  Claimant also complained of depression.  (Tr. at 168-76.)

Claimant underwent a CT of the chest with contrast on March 16, 2007, and it showed a small noncalcified pleural-based nodule laterally and inferiorly in the left hemithorax unchanged from previous examination.  Lack of change since the previous exam was suggestive of benign etiology such as noncalcified pleural plaque. Claimant had two smaller noncalcified areas of pleural thickening posteriorly and inferiorly in the left hemithorax that were not evident on previous examination.  It was recommended that these areas and the areas above be reevaluated in six months.  Claimant had patchy alveolar densities in the lingula and right middle lobe anteriorly consistent with subsegmental atelectatic changes.  (Tr. at 177-78.)

On January 31, 2007, Claimant underwent an EMG, which was normal.  (Tr. at 166-67, 179.)

On August 22, 2007, Dr. Bhirud completed an RFC Mental Impairment Questionnaire and opined that Claimant was "moderately" limited in the ability to maintain attention for extended periods, to maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without supervision, to complete a normal work day and workweek without interruption from psychologically based symptoms, and to perform at a consistent pace

without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, to travel in unfamiliar places or use public transportation and to set realistic goals or make plans independently of others.  (Tr. at 184-86.)

"Moderate" limitations are defined as those which "would interfere with the person's ability to function effectively 1/3 to 1/2 of the workday."  (Tr. at 184.)  Moderate limitations in three or more areas are stated to be equivalent to a "marked" limitation.[1]  (Tr. at 184.)

The record includes additional handwritten treatment notes and other evidence from Dr. Bhirud dated September 10, 2006, through August 13, 2007.  (Tr. at 187-93.)  Claimant reported neck pain and continued problems with depression and anxiety.  On August 13, 2007, She reported she had become calmer after treatment at Process Strategies, but was still depressed.  (Tr. at 187.)

The record includes treatment notes from Process Strategies dated July 25, 2007, through February 14, 2008.  (Tr. at 194-207.)  On July 25, 2007, Claimant was diagnosed with major depressive disorder, recurrent, severe without psychotic features and

---

[1]  This RFC Mental Impairment Questionnaire form is of unknown origin.

generalized anxiety disorder.  (Tr. at 206.)  Her GAF was rated at 55.[2]  (Tr. at 206.)  On August 1, 2007, Claimant was diagnosed with panic disorder with agorophobia and mood disorder.  Her GAF was rated at 55.  (Tr. at 201.)  On August 20, 2007, Dr. Todd examined Claimant and rated Claimant's GAF at 55.  Claimant was prescribed Seroquel and Clonazepam.  (Tr. at 198.)  August 29, 2007, Claimant's Clonazepam was increased.  (Tr. at 198.)  On September 4, 2007, Dr. Todd saw Claimant.  She reported she was feeling anxious but was mildly better.  (Tr. at 195.)  On October 24, 2007, Claimant reported mood swings and was prescribed new medication.  (Tr. at 194.)  On February 14, 2008, a treatment note indicates Claimant had been out of medication for a month and was having family problems.  On assessment, it was noted that she was "[s]table on current medication regime."  (Tr. at 207.)  Her GAF was rated at 60. (Tr. at 207.)

The record includes treatment notes and other evidence from Ira Derakhshan, M.D., a neurologist, dated September 21, 2007, through November 9, 2007.  (Tr. at 208-25.)  On September 21, 2007, Claimant complained of headaches and neck pain, occasional numbness in the right arm, thumb pain and occasional numbness and cramping in both legs along with back pain.  (Tr. at 219.)

---

[2]  A GAF rating between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers).  American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. (Text Revision) 2000).

11

On October 8, 2007, Dr. Derakhshan wrote that Claimant complained of nocturnal numbness of the upper extremities with dropping of objects and that while Claimant had a negative work up in the past for carpal tunnel syndrome, he looked at the report and "saw only digit two was done, where as the patient has classical symptoms of nocturnal numbness of the upper extremities, dropping of objects, shoulder pain, and many other manifestations of carpal tunnel compression." (Tr. at 217.) Upon examination, Claimant had weak grip bilaterally. (Tr. at 217.) Dr. Derakhshan wrote that he was confident that Claimant had carpal tunnel compression, and he planned to repeat the nerve conduction study and compare it with the results from CAMC. (Tr. at 218.) Claimant underwent EMG and nerve conduction studies on October 9, 2007. (Tr. at 210-16.)

On November 8, 2007, Dr. Derakhshan wrote that the electrodiagnostic evaluation indicated that in the upper extremities, Claimant had bilateral carpal tunnel compression, more severe on the right. (Tr. at 209.)

At the administrative hearing, Judith Brendemuehl, M.D. testified that there was very little objective evidence of a severe impairment in the record. She noted complaints related to the hands and back with normal physical examination except for mild pain on range of motion. (Tr. at 255.)

Dr. Brendemuehl testified as follows regarding the evidence of record related to Claimant's carpal tunnel syndrome:

12

[Dr. Derakhshan] a[r]gued that the prior EMG nerve
conduction study was inaccurate because it only included
the second digit.  Well, if you look at the [median]
nerve distribution, the, the digits, the thumb is
included as a separate digit.  Your index finger is
number one.  Number two is your middle or long finger,
which was included in the prior EMG.  That is the digit
that most people will consistently tell you is involved
with a conduction disturbance with regard to the [median]
nerve.  It's involved with the, the middle finger and
half of the finger on either side of the middle finger,
are the usual [median] nerve distributions.  So I have no
reason to think that that prior EMG nerve conduction
study was inaccurate.  And there's nothing in this
record, there's no physical examination that talks about
a positive Tinel or a positive [Phalen's].  Not that that
is a truly diagnostic proceeding for knowing.  But the
only thing I have is Dr. [Bhirud's] examination, where
she said there was tenderness at the base of the thumb on
the left.  And thought that a rheumatologist should be
seeing this lady. *** I have no x-rays of the back.  And
the only thing that I have are complaints of pain with
full range of motion, normal neurological examination.
And Dr. Derakhshan's nerve conduction studies of the
lower extremities clearly are normal.  And there is no
evidence of any radiculopathy in the lower extremities.
He says lower extremity findings are normal.

(Tr. at 256-57.)

When asked if she disagreed with Dr. Derakhshan's opinion, Dr.

Brendemuehl testified as follows:

Well, he tried to refute the other EMG nerve conduction
studies, stating that it didn't include as much as he
tested.  It included what is the hallmark of a positive
finding for an EMG nerve conduction study of the [median]
nerve. *** And what Dr. Derakhshan unfortunately never
includes in his records is a physical examination that
really coordinates with his statement.  He, he very often
will present just like he's done here, a subjective
complaint on the part of the patient, and then he will do
a test.  The only thing that he has said as far as in 14-
F, page 10, he says, exception being weak grip
bilaterally in his examination.  He didn't measure it.
Dr. [Bhirud] in her CE has measured the grip strength,
and has reported it and feels that it wasn't diminished.

13

So it – – again, with what I have in this record, I, I
find that there really is not anything physical that
rises to a level of a limitation, based on what I have
from the claimant's record.

(Tr. at 258.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not
supported by substantial evidence because (1) the ALJ failed to
follow the "slight abnormality" standard in finding that the
claimant's impairments and combination of impairments, including
bilateral carpal tunnel syndrome and gastrointestinal problems, are
not severe; (2) the ALJ failed to afford adequate weight to the
opinion of Claimant's treating sources, Dr. Derakhshan, Dr. Bhirud
and Dr. Todd; and (3) the ALJ failed to take into account the
physical and mental impairments in determining Claimant's residual
functional capacity.  (Pl.'s Br. at 8-13.)

The Commissioner asserts that (1) the ALJ did not err in his
step two evaluation; and (2) the ALJ did not err in weighing the
medical evidence of record.  (Def.'s Br. at 10-20.)

Claimant first argues that the ALJ failed to follow the
"slight abnormality" standard in finding that her impairments,
other than major depressive disorder and generalized anxiety
disorder, were nonsevere, alone and in combination.  In particular,
Claimant complains that the ALJ should have found her bilateral
carpal tunnel syndrome to be severe. (Pl.'s Br. at 7.)  In a
related vein, Claimant argues that the ALJ erred in weighing the

14

opinion of Dr. Derakhshan.  Claimant argues that the ALJ erred in rejecting this opinion because he never addressed the accuracy of the second EMG study performed by Dr. Derakhshan.  Furthermore, Claimant asserts that the ALJ failed to evaluate Dr. Derakhshan's opinion in keeping with the above regulations, including acknowledging the fact that Dr. Derakhshan is a neurologist. (Pl.'s Br. at 10-11.)

A severe impairment is one "which significantly limits your physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c) and 416.920(c) (2008); see also 20 C.F.R. §§ 404.1521(a) and 416.921(a) (2008); Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987) (recognizing change in severity standard).  "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1521(b) and 416.921(b) (2008). Examples of basic work activities are:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

Id.

In addition, Claimant cites to Social Security Ruling ("SSR")

96-3p, which states that

> [a]t step 2 of the sequential evaluation process, an
> impairment or combination of impairments is considered
> "severe" if it significantly limits an individual's
> physical or mental abilities to do basic work activities;
> an impairment(s) that is "not severe" must be a slight
> abnormality (or a combination of slight abnormalities)
> that has no more than a minimal effect on the ability to
> do basic work activities.

SSR 96-3p, 1996 WL 362204, 61 FR 34468, 34469 (July 2, 1996).

Regarding the weighing of medical opinions, every medical
opinion received by the ALJ must be considered in accordance with
the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d)
(2008).  These factors include: (1) length of the treatment
relationship and frequency of evaluation, (2) nature and extent of
the treatment relationship, (3) supportability, (4) consistency (5)
specialization, and (6) various other factors.  Additionally, the
regulations state that the Commissioner "will always give good
reasons in our notice of determination or decision for the weight
we give your treating source's opinion." Id. §§ 404.1527(d)(2) and
416.927(d)(2).

Under § 404.1527(d)(1) and § 416.927(d)(1), more weight is
given to an examiner than to a non-examiner.  Sections
404.1527(d)(2) and 416.927(d)(2) provide that more weight will be
given to treating sources than to examining sources (and, of
course, than to non-examining sources).  See also Ward v. Chater,
924 F. Supp. 53, 55 (W.D. Va. 1996) (A treating physician's opinion
is afforded "controlling weight only if two conditions are met: (1)

16

that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence."). Sections 404.1527(d)(2)(i) and 416.927(d)(2)(i) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under § 404.1527(d)(2)(ii) and § 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4), and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

The undersigned proposes that the presiding District Judge find that the ALJ's decision is not supported by substantial evidence because he failed to follow the regulations in weighing the medical evidence of record relating to Claimant's carpal tunnel syndrome, which lead him to ultimately conclude the condition was not severe.

In his decision, the ALJ found that Claimant's carpal tunnel syndrome was not severe for the following reasons:

> The claimant alleges having tingling or numbness in her hands. During the consultative examination on May 19,

17

2006, Dr. Bhirud indicated that the claimant had swelling and tenderness at the base of her thumb. However, Dr. Bhirud also noted that the joints of the claimant's right and left hands were normal. She found the claimant's right hand grip was 40 pounds and her left hand grip was 35 pounds. (Exhibit 4F). A Neurodiagnostic Report dated January 31, 2007, indicates the claimant had normal electrodiagnostic study. It was noted that the EMG testing did not show any significant findings or of any evidence of any neurogenic loss or muscle abnormality (Exhibit 11F, p4). In fact, Dr. Bhirud also indicated on February 27, 2007, that the claimant's EMG was "ok" (Exhibit 8F, p2). On November 8, 2007, Dr. Derakhshan did note that an EMG on October 9, showed the claimant had bilateral carpal tunnel compression, more severe on the right (Exhibit 14F). However, the claimant has no objective findings on examination to support the severity of this impairment. In fact, as discussed below, this opinion is well supported by the testimony of Dr. Brendemuehl, the impartial medical expert at the hearing.

(Tr. at 21-22.)

The ALJ further stated that

Dr. Brendemuehl indicated that concerning the claimant's allegation of problems with her hands the evidence includes an EMG report dated January 31, 2007, which was normal. She testified that Dr. Derakhshan questioned this report by indicating that only digit two was done and therefore he had the claimant undergo an electrodiagnostic evaluation on October 9, 2007, which showed bilateral carpal tunnel compression, more severe on the right. However, Dr. Brendemuehl testified that she disagrees with this finding. She noted that she has no reason to believe the first EMG study was not accurate because if you look at median nerve distribution the digit of the thumb is included as a separate digit. Dr. Brendemuehl indicated that the index finger is number one and the middle or long finger is number two, which was included in the prior EMG. She testified that this is the digit that most people will consistently tell you is involved with a conduction disturbance with regard to the medial nerve. Dr. Brendemuehl noted that it is consistently the involvement of the middle finger and half of the finger on either side. She indicated that Dr. Derakhshan relies more on subjective complaints in that he never includes physical examinations that support

his testing.  Dr. Brendemuehl testified that Dr. Bhirud found only that the claimant had some swelling and tenderness at the base of her left thumb. She noted that the claimant had no evidence of positive Phalen testing in the record.  Dr. Brendemuehl indicated that the claimant has no severe physical impairment and therefore no limitations.

(Tr. at 22-23.)

The ALJ's reasoning in finding that Claimant's carpal tunnel syndrome is not severe is faulty for a number of reasons.  First, the ALJ erred in relying on Dr. Brendemuehl's opinion and rejecting the opinion of Dr. Derakhshan without adequate explanation and analysis in keeping with the regulations cited above.  Dr. Derakhshan is a neurologist who examined Claimant and conducted the most recent diagnostic testing.  In comparison, Dr. Brendemuehl is a general surgeon who did not examine Claimant.  Nowhere in the ALJ's decision does he acknowledge these facts or analyze them in compliance with the above regulations in explaining the weight afforded Dr. Derakhshan's opinion or in finding Claimant's carpal tunnel syndrome nonsevere.

Furthermore, while Dr. Brendemuehl had the benefit of reviewing the evidence of record, her explanations about why the evidence from Dr. Derakhshan does not support a finding of severe carpal tunnel syndrome, which findings were in turn adopted by the ALJ, are not convincing.  Dr. Brendemuehl disagreed with Dr. Derakhshan's opinion because it was not supported by physical examination findings, because it was inconsistent with other

evidence of record and because the first EMG was accurate and Dr. Derakhshan's reasons for rejecting the first EMG were faulty. Dr. Derakhshan conducted a second EMG (and nerve conduction study) because he found that only digit two (the middle finger) was done on the first EMG. His EMG included digits one, two and three. Dr. Brendemuehl made the point that the first EMG was sufficient because the middle finger is most typically involved with a conduction disturbance with regard to the median nerve. While this may be true, Claimant's neurologist determined that a second, more inclusive EMG and nerve conduction studies were necessary, and they were positive for carpal tunnel syndrome. Nevertheless, Dr. Brendemuehl attempts to argue that the older EMG is sufficient and accurate, despite Dr. Derakhshan's recent and more extensive testing.

Dr. Brendemuehl dismissed Dr. Derakhshan's opinion because it was not supported by his own physical examination, which found only weak grip bilaterally, and because the treatment notes from Dr. Bhirud found no evidence supporting a diagnosis of carpal tunnel syndrome. This reasoning also is faulty in that Dr. Brendemuehl relied on older treatment notes and other evidence from Dr. Bhirud to discount the more recent opinion of Dr. Derakhshan. Dr. Derakhshan did find weak grip bilaterally, and Claimant reported nocturnal numbness of the upper extremities, dropping of objects and shoulder pain. (Tr. at 217.) In short, the evidence of record

20

suggests a progressively worsening condition, but the nonexamining medical expert, who is not a neurologist, attempted to justify a finding of nonseverity based on older medical evidence and a less than convincing explanation as to why objective testing and the opinion of an examining neurologist should be ignored.  Such a scenario requires remand for a careful weighing of the medical evidence and a more thorough consideration of whether Claimant's carpal tunnel syndrome is in fact a severe impairment.

For the reasons discussed above, the undersigned proposes that the presiding District Judge find that the ALJ's decision is not supported by substantial evidence.  The remaining arguments raised by Claimant can be addressed on remand.

It is hereby respectfully RECOMMENDED that the presiding District Judge REVERSE the final decision of the Commissioner, and REMAND this case for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g) and DISMISS this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable Thomas E. Johnston.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings

and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

_____June 21, 2011_____
Date

Mary E. Stanley
United States Magistrate Judge